The next case today, number 242043, United States v. Alberto Rebollar Osorio. Will counsel for the appellant please come up and introduce yourself on the record to begin. Good morning again, your honors. Brian Kleinbord for the United States. If I may please reserve three minutes for rebuttal. You may. Thank you. May it please the court, there are two issues before the court in this case. The first is whether the appellee is covered by the plain text of the Second Amendment. And second, even if he is, is 18 U.S.C. 922 G5A constitutional because it's relevantly similar to the nation's historical tradition of firearm regulation. Unless my colleagues object, I think it might be helpful if you started with the second issue first. Certainly, your honor. So at step two of the Bruin test, even if the plain text of the Second Amendment presumptively protects the appellee because he falls within the people. This court should join a number of courts, both pre and post Bruin, that have concluded that a long tradition exists of disarming individuals like illegal aliens. And so I would point to a number of historical markers that support that. Starting with the English tradition that one's alien status carried with it a smaller basket of rights. An alien who was born outside the dominions of the crown was given fewer rights than those to natural born subjects. Furthermore, an alien's rights could be conditioned on his allegiance to the laws and the government. Land and gun ownership were historically linked. The right to own guns in 18th century England was statutorily restricted to the landed gentry. That's from the 11th Circuit's decision in Jimenez, Shalom. These historical laws provide evidence, early evidence, that an alien's lack of allegiance to the crown barred him from keeping arms. This is the conclusion. Does that mean a renter couldn't have a gun? Pardon? Does that mean a renter couldn't have a gun? No, I don't think it meant a renter. And why would we conclude from the landed gentry historical example that it would apply here but it wouldn't apply to a tenant? The landed gentry aspect of it is just one. That applied to those who existed outside, who were thought of as aliens at the time, who were outside of the political community. Renters, just because they didn't own land, might not have been classified the same way. And therefore, they may not have had the same restrictions on firearms that aliens did at the time. Let me ask a different way. Is there historical evidence that aliens, just by virtue of being aliens, could not have guns? I think if you look at the English Declaration of Rights, which the Supreme Court has said is the predecessor to our Second Amendment, aliens were thought to be people who were not subjects could not own a gun under the English Declaration of Rights. Now, we don't have subjects, we don't call people subjects today, but the framers thought of citizens in the same way that the English thought of subjects. And so, if in the English Declaration of Rights subjects were thought to exist outside of the political community and were not entitled to own guns, I think it's fair to infer that the Second Amendment had the same idea about people who existed outside of, who were not subjects, who were not citizens. And so, the other thing I would say to that, Your Honor... In the 1790s, what did it mean to be an alien as opposed to being a citizen? Well, Your Honor, I think that's an important, it's something important to think about in this case, that immigration laws that existed at the time of the founding were very different from modern immigration laws. And so, and this is a point... How is that? Well, because at the beginning of founding, the country was small, we were welcoming people and the naturalization process was much easier than it is today. So, we don't necessarily think... This is a point I think that my opposing counsel makes in her brief, that there wasn't even something called an illegal alien at the time. So, what we have to do is we have to look instead to a principle that existed at the time and that was people who, whether it's loyalists or Native Americans, enslaved people, and again, some of those classifications wouldn't survive scrutiny, certainly wouldn't survive scrutiny today under the Constitution. So, there were people who were not citizens, who were residing permanently in the United States? I'm sorry, Your Honor, could you repeat that? Sure. Let's focus on the 1790s, 1800. Were there people who were not citizens of the new country who were residing permanently within the country? Yes, I think there were. And is there any evidence that any of them were not allowed to carry guns? Yes, I think that applies to... Other than those... Let's take enslaved people and Native Americans and look at them separately for a moment. Other than those two groups, were there any groups who were deprived of the right to carry a gun under the newly enacted Second Amendment? I think the... I don't know if the loyalists were technically considered citizens at the time, but they certainly were a group that was viewed at the time to be outside of the political community. They weren't full members of the new United States. They didn't have an allegiance to the new country, and therefore, they existed outside of the political community. Just to follow up on Judge Kadda's question, just the fact of being an alien permanently residing in the United States in the 1790s, was that a basis for denying them gun ownership? It may not have been, but that's not the level of particularity that the government needs to cite. Okay. Then just to be clear, if that's right, I'm a little confused. What was the relevance of the point you were making about subjects under the English Declaration of Rights? That seemed to apply generally to anybody who was not a subject. Yes, it did. Just not being a subject meant gun ownership could be denied. That would suggest alienage. Yeah. Now you're saying, no, not alienage. Maybe I misunderstood your previous question, Chief Judge Barron. But yes, I do believe that the principle that you can extract from the English Declaration of Rights is that subjects is a good substitute for citizens. And subjects were denied the right. But in the 1790s, alienage alone, there's no history of that being a basis for denying gun ownership in this country. Is that right? Well, the other thing I would point to, Your Honor— Just before you go to the other thing, how about my thing? Could you repeat the question? Yeah. I take your point about the Declaration of Rights. You're saying you had to be a subject. And that would suggest if you were not, which might have meant you were foreign, that could be a ground for not having a right to a gun in England. Then Judge Kayada asked you, okay, what about aliens who are in the United States, non-citizens living here? Is there any history in this country of making that a basis for denying gun ownership? I think you said no. Well, I want to clarify that. In Carbajal Flores, which is the Seventh Circuit that was decided recently, in addition to the sources I've cited, they note that the new states formed their own laws that are important in understanding who was able to possess a gun. And so the Commonwealth of Pennsylvania and North Carolina passed laws which prohibited guns from persons who were disaffected by the state. But I think more to the point, some of the first state constitutions extended arms-bearing protections only to citizens. And that's— But that just is the non-grant of a constitutional, right, under the state constitution. Is that irrelevant? I think that's irrelevant. The question is what constitutional rights you got as a matter of state law as opposed to what regulations were practiced? In other words, that seems like a different historical inquiry. If we're looking at what rights were granted under state constitutions is different than whether there was a tradition of regulating. Well, I think it's the other side of the coin. What do you mean, the other side? If you were not a citizen, you were not entitled to own a gun. As a matter of state constitutional law, but was there any history of actually restricting them from having it? Well, I think, Your Honor— I think you're saying the answer is no. It's just taking a long time to say it. No, I'm— I mean, if there was such a history, what is that history? The history, again, whether there's— whether there are laws that the government can point to that are similar to the current version of 922 G5A is not the inquiry that— This wouldn't be similar to that. This would be broader than that. I'm just asking, drawing from the analogy you started with with the Declaration of Rights, whether there was a tradition in this country of restricting gun ownership based on alienage. There is a historical through-line of restricting guns to classes of people, broad classes of people who were thought to exist, who did not have allegiance to the country, did not exist within the political community, did not have all the rights— Was alienage a class that fell into that? Just alienage qua alienage? There may not be a law that just strictly refers to alienage being that class. Okay, so then what you're really saying is what we should be analogizing it to is the loyalist laws or the anti-Catholic gun ownership laws or the slaves can't own laws or the Native Americans can't own laws. Yes, and we think— So what is it about being here unlawfully that makes that status a good analogy to those statuses? It's the lack of allegiance to the country. People who were here unlawfully did not go through the nationalization process, did not—have not accepted— have not been accepted into the country through the naturalization process. There's actually an oath of allegiance that citizens swear to when they finish the naturalization process and become citizens. So the whole notion of allegiance and loyalty we think is a good analogy to what the current statute is doing to prevent those unlawfully in the country from possessing guns to the historical precursors which denied guns to people who existed outside of the political community. I'll reserve the rest of my— Counsel, on your argument, do you have any analogs that you can provide me post-Civil War? Yes, I do, and I can try to— I don't have those at my disposal right now, but it may be when I get back on rebuttal I'll be able to cite those. Thank you. And just one last question. On this allegiance point, what is the significance of the general notion with respect to allegiance that all people here owe a temporary allegiance to the country that they're in, which is a pretty familiar principle and that's why people that are here expected to follow the laws when they're here, even if they've broken them in some other respect and are also owed a duty of protection while they're here. That's certainly true, Your Honor, but the sort of connections that my opposing counsel talks about, you know, working, developing social and economic ties, those are certainly forms of allegiance, but not the sort of— they're here illegally, they didn't go through the process to become legal citizens. At the time that Mr. Rabio Osorio was arrested, he hadn't, as far as I know, taken any steps to become a U.S. citizen. Those were all done after his arrest. So he's not doing the things that he should be doing in order to, I think, really be recognized as someone who's— in terms of the allegiance and loyalty that I think the cases are talking about, those are not the sort of things that get him there. What were those things he should have been doing other than leaving the country and showing up under lawful entry? Well, taking steps toward the naturalization process, Your Honor. Taking steps to become a documented citizen. Was that required of the aliens we were earlier talking about who were here, not as citizens in the 1790s? Yes, I believe so, based on my reading of the cases. That they could— if they went through the naturalization— No, if they did, but did they have to be going through that process in order to be permitted to have a gun in the 1790s? I don't know if the laws— I don't know if it's a perfect analogy to how things were done in the 1790s, but I'm just saying— In other words, I'm just a citizen of a different country, and I'm here in the 1790s, just living. I don't have any desire to be a U.S. citizen. I haven't renounced my citizenship in the foreign country. Is there any indication that just because I'm a foreign citizen in this country, I couldn't have a gun? No, but I think, Your Honor, that gets back to the fact that immigration laws are different, and if I could just— If I could just— If you look at what Justice Sotomayor said in Rahimi, she said, given the fact that the laws of founding were more likely to protect husbands who abused their spouses than offer some measure of accountability, it is no surprise that that generation did not have an equivalent to 922 G-8. Intimate partner violence was not the same in the 1790s as it is now. Just as immigration law— I guess just one last turn on this, but I guess the thing I'm struggling with a bit is I can see lots of reasons why a person's continuing unlawful status could give rise to concerns about gun ownership. It manifesting a lack of loyalty to this country distinct from an ordinary alien who is here in the 1790s who showed no intention of becoming a citizen of the United States. I'm not quite grasping that point. It's not just the lack of loyalty, Your Honor. I think the broad principle is this statute is constitutional because there's a history of categorically disarming classes of individuals who, for whatever reason, the legislatures of the time thought existed outside of the political community, outside of the polity, didn't have all the rights that citizens have. That, we think, is a good analogy to what this statute does and why the historical laws support the constitutionality of this statute. We have quite recently twice worked at some length and detail through the Bruin analysis. I take it you see no guidance for us in either of those opinions. Are you talking about First Circuit opinions post... I'm talking about Ocean State and the Massachusetts assault weapon case. No, I don't mean to say that I don't see any value in those. I think the arguments here focused on the 922 that, you know, this court hasn't had an opportunity to address the felon in possession statute. Most of the, I think, pertinent law that both the government and opposing counsel have cited have been courts that have addressed this particular subsection of 18 USC 922. But I'd be happy to address those cases if the court would find it beneficial. Thank you. Thank you. Thank you, counsel. Will attorney for Applee please come up and introduce yourself on the record to begin. Good morning and may it please the court my name is Jameisa Drake and I'm here today on behalf of the Applee, Mr. Rebolo Osorio. I certainly don't want to be presumptuous, but I'm also happy to start with the Bruins Step 2 analysis. The government has failed to carry its burden of demonstrating a relevant historical tradition of comparable disarmament. As your honors have sort of probed I think at length, neither aliens nor illegal aliens were categorically disarmed in the founding era. The concept of an illegal alien didn't even exist. Federal admissions control didn't begin until 1875. Gun violence... Doesn't that fact cut against you in some ways? Because if the situation that we now have did not exist then it becomes a little difficult to infer from the absence of regulation of that condition that there therefore was no power to regulate it. It simply wasn't presented. In an ocean state that's what we confronted with restrictions on the size of gun magazines. So doesn't that simply say that we have to start looking for other ways that might provide an analogy and that we can't rest everything on the absence of a regulation of this particular condition? Yes. So I agree that that then causes us to see what we can search for and find in the historical record from which we might be able to draw inferences or parallels. But key to that is where your honor began with the question which is defining the problem. The government tells us it devotes two pages to its brief, pages 13 and 14 what the purpose of 922G and 922G5 is. And it tells us that that purpose is related to So using that as a starting point we look in the historical record at the time I think we begin at the time of the founding and say what can we discern about founding era responses related to gun violence some aliens who are behaving badly and just generalized concerns for law breaking. And here Rahimi provides a good road map. It explains that none of these problems was addressed. Well Rahimi doesn't say Rahimi instead tells us how they were addressed by surety going armed laws and through the ordinary criminal process but conspicuously absent from that is the categorical disarmament of aliens or illegal aliens. Certain disfavored groups like slaves and Native Americans were categorically disarmed in order to subjugate them but that is not 922G or G5A's purpose. Loyalty oaths are also a poor analog. They apply to people who had taken up arms in revolt or against the United States and then refused to swear allegiance to the new nation and that's materially different than a person like the defendant who has never taken up arms against anyone and who has in fact begun the process of becoming a United States citizen and declared his intent to take that oath of allegiance to the country. Is it relevant that that step that your client took came after the arrest? Yes, so that is true but and this is why I think the sufficient connection test is important he has demonstrated loyalty and allegiance to this country and to his community by being a protective member of the location where he lives. He, according to there's findings in this record that he has helped his neighbors. That all goes to step one though, on just the step two point I thought you were suggesting that the fact that he has taken the step of saying I'll take the oath relates to the step two point because to the extent loyalty matters it shows that he is loyal but what about the significance of that having occurred only after the arrest? Right, so there is some slippage here. The government uses these notions of who is a member of the polity, who is part of the people at both Bruin step one and step two. It's certainly relevant at step one but for purposes of step two he has demonstrated, not through spoken word, not by officially taking an oath, but he has demonstrated his allegiance to the country in the most basic way that this court probed with my friend at the beginning. He has come here, he has submitted to the laws of this country and in return he has been a good steward of the community in which he lives. Likewise, appeals to Can I just ask so I understand how you think we should do the inquiry. Suppose it was the case that alienage was a permissible ground for restricting a class of persons and the reason for it was that the alienage gave rise to a suspicion about their loyalty to the country. Suppose there was a historical basis for that. And yet in 922 there is no indication that was the purpose of 922. What leads you to think that the relevant inquiry for our purposes is that we first have to identify what the purpose of the regulation at issue is and then decide whether the class of persons can be restricted on that purpose by historical analogy. Rather than simply the persons who are the object of the regulation, we look is that a group of persons to whom a restriction can be imposed class wide. Do we have any law that tells us which of those two things is what we're supposed to do? I would cite to Bruin but in particular Rahimi which emphasizes that both the how and the why has to line up. They have to be sufficient comparators. In asking the why question do we ask it with respect to the why that is articulated in the statute as the reason for the regulation as opposed to the class being regulated and then ask can that class be regulated historically. Yes, I believe you must, otherwise you run into the danger present with interest balancing. So it's not a question of can the court define any good reason that Congress Not any good reason, any good tradition of regulating. Right, so That's not interest balancing, that's just historically is there a reason to do it. If there is, then it doesn't matter why the particular statute chose to do it. All that would matter is that there's a tradition that it can be done to such a class. So, the reason that I disagree with that is because then you're taking this inquiry outside the context of the case that's presented to this court. So the issue presented here is not could Congress have drafted any statute with the purpose of that matches a historical analog. It's does 922 G5 have a why that is comparable to a why that we find in the historical record. And the answer to that is no. The government our position is has not satisfied its burden. So I guess what I'm asking is are you saying that the only why here that the government can rely on is a danger theory? And then they'd have to show somehow this person this there is a historical tradition of showing that persons like this could be regulated because of the danger they pose? Well, I'm not, you know, I'm not even sure that it's danger. The government, despite the fact that when courts were doing interesting balancing really did engage with what is the purpose of 922 and in particular G5A, the government as I say only gives us a very cursory glance at the purpose for 922. In its brief, it says that the principal purpose was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, and incompetency. No mention of loyalty, no mention of alienage. So then, and this is the exercise I worked through in my brief, if that is the why, and I don't dispute that that is the why, age, criminal background, or incompetency, then we look and see what was done at the founding era to address those concerns. And as Rahimi helpfully, I think, lays out, there were a number of things. Those were concerns during the founding era. They were addressed in a variety of different ways by a multitude of different laws, none of which involved the categorical disarmament of aliens or illegal aliens. If I could just sort of talk also about this notion that illegal aliens should be dispossessed of their weapons because they're sort of in a perpetual state of law breaking. Our position is that extrapolates at far too high a level. And I think it's very clear, very important to be clear about what we're talking about when we're talking about this particular type of law breaking. So entering the country unlawfully is a crime. It's a misdemeanor or a felony. But it is a strict liability offense. And there is no evidence on this record that this defendant entered unlawfully. He came here as a child. And there's nothing in the record about what he was told by the adults in his life about the circumstances of his entry. You said it was a felony? It can be a felony if you have been ordered removed and then you return. Wouldn't that be handled by a separate section of the statute? Yes. My point is simply being here unlawfully, entering unlawfully. What we're talking about is just the misdemeanor group. I'm sorry, Your Honor? Isn't at issue in this case, your client committed only a misdemeanor? No. My client is accused by virtue of 922 G5A of remaining unlawfully. That is the only thing that that statute contemplates. That is a civil violation. And the reason that characterizing So my point is there's no felony at issue here? No, Your Honor. Not at all. There's not a misdemeanor at issue either. There's just the fact that he is in violation of a civil regulation. But if doing that, if being in violation of any law is enough to disarm someone, then the reality is that the Second Amendment will cease to have any practical protection for the vast majority of Americans. The consequence of being caught for this person for the infraction are quite, quite severe, which in some ways would tend to support a reason to be concerned about such persons having weapons given their interest, quite distinct from the interest of an ordinary person who has committed a misdemeanor that no one's yet found out about, to be concerned about being found. Correct? I'm not sure that I'm following that. Well, the ordinary person who's committed, say I jaywalked earlier today and no one knew about it. Okay, that's not something that's causing me a huge amount of concern. And therefore, me having a weapon even though I did that, doesn't seem like the kind of thing that people should be particularly alarmed by. In contrast, even though this person hasn't committed a felony or anything else, they have a status that if discovered has quite dramatic consequences for them, which gives them incentives to not want to be found in having such a status, that just as a logical matter, might lead one to be concerned about them then having a weapon. I think I understand Your Honor's point. I know we're not allowed to think about interest balancing, but one could deduce that a purpose for restricting this class of persons from having guns, related to a similar logic. If we took that as the why, even though we didn't have, as Judge Cotter was pointing out, an earlier regime of  immigration the way we now do, so we didn't have people similarly in the same status as millions of people now are. Might we say there is an analogy of some kind between that set of concerns about why we wouldn't want this class to have guns with some of the classes that historically were of concern in having guns? Right. I think I understand. You see judges, particularly in the early opinions where they do engage with interest balancing, engage on this issue. Being in the status of being here unlawfully may lead to certain things like avoiding law enforcement, or when you are encountering a law enforcement officer behaving in a manner that you wouldn't otherwise, and perhaps that's not a way that we want people to behave, etc. One response, not my only response, but one response to that is the government has failed to establish here in this case that that has anything to do with the purpose of 922 G5A. I do not believe it's fair for this court to just deduce that in the absence of the government providing proof to that effect. Secondly, there are lots of reasons. In particular, the state of Massachusetts their Supreme Court has been very has written interestingly on this issue. There are lots of reasons why I'll say ordinary Americans might not want to have an encounter with a law enforcement officer, might similarly seek to avoid that, or might similarly react with some degree of hostility were that encounter to occur. And so there again, abstracting to these very high principles that encapsulate too many people runs afoul of the point of the Second Amendment, which is to have a right that's relatively inviolate. Well, couldn't you just as well hypothesize too that someone who has the status of having illegally entered has more than the average motivation to comply with the laws so that they're not apprehended? That's right. And I think it's important to note that this is an as-applied this case is coming to this court as an as-applied challenge, and one of the distinguishing features in this case, as opposed to many of the others considered by other courts, is this client has never been even arrested before this incident. He is a law-abiding person in every other way except that he is in this state of civil discordance with the law. Thank you. Thank you, counsel. Will attorney for Appellant please come up and reintroduce yourself on the record? You have a three-minute rebuttal. Thank you, Your Honors. Just on the last point that opposing counsel made about this being an as-applied challenge, the government's understanding is that the case that came before the court in May, Vizcaíno-Peguero, is also before the court as an as-applied challenge, and I don't think that there are any facts in this case that distinguish it from the facts in terms of the sufficient connections and so forth that would make those cases different. As far as the point Chief Judge Barron about the purpose, do we look at the purpose of the statute today? I don't think there's a lot of room for that, or any room under the Bruin and Rahimi test. What Bruin and Rahimi tell us is that when assessing whether a law complies with the Second Amendment, the court should consider whether the challenge regulation is consistent with the principles that underpin our regulatory tradition, and whether the new law is relevantly similar to laws that our tradition is understood to permit. I think for better or worse, it's a historical inquiry. We look at whether there's a law that operated the same way that the current law operates, a principle that can be extracted from those laws. Don't you need to know what the societal problem or condition is today, so that you can then look to see if there's an analogous one and how it was dealt with? Don't you have to start with what's the problem here that the statute is dealing with? Yes, I do think you need to do that, but I don't think you're limited to... And what is it? Well, I think certainly Congress rightly believes that illegal aliens who are here without going through the naturalization process could pose a danger by having a gun. If that were true, there would be empirical data that would support it. Yes, but I don't think that's the only rationalization, the only reason that Congress supported this law. But I think, again, I think I would go back to the point that I was making in my opening argument, which is Congress can determine that certain groups categorically who are outside of the political community, who are not part of the polity, who don't have access to the country. Can I ask it this way? Suppose we have two statutes. One says persons unlawfully in the country cannot have a weapon, cannot have a gun. And then it says purpose, because we can do it. Okay, that's one statute. Second statute, persons unlawfully in the country cannot have firearms. Purpose to protect public safety because of our interest in stopping crime. Do we analyze both those statutes the same under Bruin or differently? No, I would think that the second statute would I thought you were going to answer that we assess them the same. Well, no, I think certainly under Bruin, oh, how do we analyze them under Bruin? Well, to the extent that Bruin says we look at historical regulations, I don't know that, I certainly think the second statute is a much better statute. Well, then you're saying that purpose matters. Then you're saying purpose matters. I think you, I thought the government's position was the purpose of the statute does not matter, and all we look at is the class of persons being restricted, and we look at whether historically has that class ever been restricted. Now you're saying, though, that actually what matters is what was the purpose of the statute. No, the point I was trying to make is that purpose doesn't matter but certainly you asked which would fare, I thought the question was which would fare better under Bruin. Neither would fare any better than any other under your theory, I think, right? Perhaps so, yes. Perhaps, or, I mean, yes, right? Because we don't care why they passed the statute. Yes. And then we just ask and this is, I guess, the puzzlement for me, in Bruin it says we ask how and why. So how does the why question work if we don't care about the purpose? The why is, the why, I think looks at the principles as to why firearms were excluded for certain groups of people, and I think the why again here is groups were excluded at the time of the founding because they existed outside of the citizenship and that's the same why that informs 922 G5A. And just to be clear, that means then the government's position is no alien can have a firearm? No. Our position in this case is no. So citizenship is not the test? No. Illegal aliens, those unlawfully in the United States, cannot have a firearm. We're not taking a position on other... So then when you said that's because citizenship, people outside the citizenship couldn't have it, that turns out not to be relevant to your test. Well no, that was relevant at the time of the laws at the time of the founding. Lack of citizenship, lack of allegiance to the government, not being a subject. So again, if we go back to the idea that subjects were excluded from having guns under the Declaration of Rights. That would suggest that all aliens can't have them. It would suggest that aliens is I think a different...aliens the way we think of them now may be different from the way they were thought of then. But you must be saying that Congress has the power to exclude non-citizens from gun ownership? Yes. Yes. All of them? Certainly all non-citizens who do not have a lawful presence in the country. So then you're saying that for step one of Bruin that we the people include some aliens but not others? Well no, because again, we're not... If it doesn't include any aliens, then why can't Congress restrict gun rights by any of them? I think the Court covered the issues regarding step one in its prior case Vizcaíno-Peguero and I think that...I think Judge Queira, your question goes more to the analysis at step one, which is whether the Apoly is considered part of the people. Assuming that a person who is an alien can be part of the people, at step two are you saying all aliens can be denied gun ownership? I'm saying the Court doesn't have to... I know that we don't have to. I'm asking what your position is. I think that our position may not be as strong if you were discussing other groups of aliens who have status, who are long-term, like permanent residents. And the reason this is different is because by being here unlawfully, that shows less loyalty than the person who is not a citizen of this country, has no intention of being a citizen of this country, and is a citizen of a foreign country. I'm sorry, can you repeat that, Your Honor? Yeah. You're saying the person who is here unlawfully is categorically less loyal than the person who is here as a foreigner with no intention of becoming a United States citizen and retains their citizenship in the foreign country. I'm saying a person who comes here unlawfully and has taken no steps to become a U.S. citizen is certainly closer to the groups that were excluded from people who come here and make efforts to become part of the citizenship. Thank you, Your Honor. Did you get a chance to... Yes, Your Honor. I'm sorry. I could not find any... I think the question was about... Post-Civil War analogs that you would rely on. No. I know that... I think that they may be cited in our briefs. I know that the courts have said that in sort of an order of importance in looking at historical laws, they're less important but certainly informative. But I was focusing more on the laws at the time of the founding. Thank you. Thank you, Counsel. That concludes arguments in this case.